**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION**

JEREMY WAYNE McCLARD                                    PETITIONER
ADC #652338

v.                              NO. 5:13CV00315-KGB-JTR

WENDY KELLEY,[1] Director,                              RESPONDENT
Arkansas Department of Correction

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

## INSTRUCTIONS

The following Proposed Findings and Recommended Disposition ("Recommendation") have been sent to United States District Judge Kristine G. Baker. You may file written objections to all or part of this Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection; and (2) be received by the Clerk of this Court within fourteen (14) days of the entry of this Recommendation. By not objecting, you may waive the right to appeal questions of fact.

---

[1]Wendy Kelley became Director of the Arkansas Department of Correction on January 13, 2015, and is automatically substituted as Respondent pursuant to Fed. R. Civ. P. 25(d).

## I. Background

Pending before the Court is a 28 U.S.C. § 2254 Petition for Writ of Habeas Corpus filed by Petitioner, Jeremy Wayne McClard ("McClard"), an Arkansas Department of Correction prisoner. *Doc. 2-1*. Before addressing McClard's habeas claims, the Court will review the procedural history of this case in state court.

On July 1, 2011, a Hot Spring County jury convicted McClard of first degree murder. He was sentenced to 480 months of imprisonment. (R. 60.)[2]

The evidence at trial showed that, on June 24, 2010, Allen Cummins drove to McClard's home, where McClard shot him, in the head, through the driver's side window of Cummins's vehicle. McClard then opened the door, pushed Cummins over into the passenger seat, and drove the vehicle to a cemetery down the road. He parked the vehicle and walked home. The next morning, a man was driving past the cemetery and saw Cummins's car. He approached the car, saw Cummins's body slumped over in the front passenger's seat, and notified the police.

After determining that Cummins's death was a homicide, the police developed McClard as a suspect. In his first two statements to police, given on June 25 and June 26, 2010, McClard denied shooting Cummins and provided detailed descriptions of two unknown men, driving a red Nissan Pathfinder, who purportedly followed

---

[2]All references to the record are to the three-volume record of McClard's criminal proceedings in state court, submitted as Resp't Ex. A to *Doc. 17*.

Cummins when he left McClard's house. On June 28, 2010, while McClard was at the Hot Spring County jail, he gave a third statement to Chief Deputy Aaron Collier, admitting that he shot Cummins but claiming it was an accident. The police later located McClard's .22 rifle near where he had indicated, on the ground under leaves and pine straw.

One of McClard's friends, Lindsey Ensley, testified that McClard was addicted to pain pills and bought them from Cummins. She testified that, a few days before the shooting, McClard said he wanted to bash in Cummins's head and steal his pain pills. Ensley testified that McClard asked her for a ride to Cummins's house so McClard could rob him, but she declined.

McClard's cousin testified that Cummins had refused to sell McClard any pills because McClard owed Cummins money. Several witnesses testified that McClard had a drug problem and was addicted to pain pills, but was not violent.

McClard testified that the shooting was an accident. He admitted that Cummins was his "regular" supplier of pills and that Cummins had cut him off due to his debt. He testified that Cummins came to his house on June 24, 2010 to try to sell him some pain pills. McClard testified that he had been working in the garden and that he had his rifle with him because he might want to shoot a squirrel or a snake. He walked up to Cummins's vehicle carrying the rifle and, when he pulled out his wallet to show

Cummins that he did not have any money, the gun accidentally went off. He explained that the gun must have bumped the car, or it caught on his shirt, because he denied pulling the trigger. He stated that he panicked because he was on parole and did not want to go back to prison. He then hid the gun and drove Cummins and the car to the cemetery.

On direct appeal to the Arkansas Court of Appeals, McClard argued that: (1) the trial evidence was insufficient to prove that he possessed the requisite intent for first degree murder; and (2) the trial court erred in refusing to grant a mistrial when a witness referred to a plea offer. *Doc. 16-2.*

On October 10, 2012, the Arkansas Court of Appeals rejected these arguments and affirmed McClard's conviction. *McClard v. State*, 2012 Ark. App. 573.

On November 26, 2012, McClard filed a *pro se* petition for post-conviction relief under Ark. R. Crim. P. 37.[3] *Doc. 16-5.* On February 5, 2013, the trial court dismissed the Rule 37 petition because McClard never served the prosecuting attorney. *Doc. 16-6.* McClard did not appeal.

On October 1, 2013, McClard initiated this habeas action. In his habeas papers, he argues that his federal constitutional rights were violated because:

---

[3]In his Rule 37 petition, McClard argued that his trial attorney was ineffective for failing: (1) to file a motion to suppress McClard's June 28, 2010 custodial statement; (2) to call an Arkansas Game & Fish warden to establish that .22 rifles can accidentally discharge; and (3) to timely move for a mistrial after a witness mentioned a plea offer.

(1)     His trial counsel was ineffective for failing to move to suppress his custodial statements given on June 26 and June 28, 2010;

(2)     His trial counsel was ineffective for failing to timely move for a mistrial after a witness mentioned a "nonexistent" plea offer;

(3)     The state failed to present sufficient evidence to prove that McClard committed first degree murder;

(4)     The state courts applied an erroneous standard in determining that he waived his right to counsel; and

(5)     His trial counsel was ineffective for failing to call a ballistics or firearms expert.

*Docs. 2-1, 7 & 27.*

Respondent argues that McClard's claims are either procedurally defaulted or fail on the merits. *Doc. 16.*

For the reasons explained below, the Court recommends that all of McClard's habeas claims be dismissed, with prejudice.

## II. Discussion

### A.     McClard's Challenge to the Sufficiency of the Evidence

McClard argues that the evidence at trial was insufficient to prove that he acted with the requisite intent to commit first degree murder because: (1) none of the state's witnesses saw the shooting, or McClard with the body or the weapon; (2) the state's proof of a "purposeful" shooting "relies heavily, if not solely" on Lindsey Ensley's testimony, which was "contradictory and untrustworthy"; (3) nothing in the testimony

of the law enforcement officers or the medical examiner proved the shooting was "purposeful"; (4) the bullet retrieved from the victim's body could not be identified as having been fired through the barrel of McClard's rifle; (5) the medical examiner's testimony regarding the trajectory was consistent with McClard's account of an accidental discharge; and (6) a police officer testified there was "no sign of robbery," contradicting the state's theory that the shooting occurred as part of a robbery. *Doc. 2-1, at 8-9.* Respondent argues that this claim was reasonably adjudicated in McClard's direct appeal.[4]

Claims challenging the sufficiency of the trial evidence "face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012). First, "it is the responsibility of the jury – not the [reviewing] court – to decide what conclusions should be drawn from evidence admitted at trial." *Id.* Evidence is constitutionally sufficient to support a conviction whenever, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the

---

[4]Respondent also argues that McClard's sufficiency-of-the-evidence claim is procedurally defaulted because he raised only state law arguments in his direct appeal. While Respondent is generally correct that a habeas petitioner must refer to a specific *federal* constitutional right in presenting his claims in state court, the Eighth Circuit has held that "[a]ny challenge to the sufficiency of the evidence to convict in a state prosecution is necessarily a due process challenge to the conviction." *Satter v. Leapley*, 977 F.2d 1259, 1262 (8th Cir. 1992). Accordingly, this Court concludes that McClard properly exhausted this claim.

essential elements of the crime beyond a reasonable doubt."[5] *Id.* at 2064 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Second, where a state court has determined that the trial evidence is sufficient, that decision may not be overturned on federal habeas review simply because the federal court disagrees with the state court. *Id.* at 2062. Instead, under 28 U.S.C. § 2254(d)(1), the federal court may grant habeas relief only if the state court decision was contrary to, or an objectively unreasonable application of, clearly established United States Supreme Court law. *Id.*

In adjudicating McClard's direct appeal, the Arkansas Court of Appeals expressly found that the evidence was sufficient to prove that he acted "with a purpose of causing the death of another person," as required for a first-degree murder conviction:[6]

> A criminal defendant's intent or state of mind is seldom capable of proof
> by direct evidence and must usually be inferred from the circumstances
> of the crime. The existence of criminal intent or purpose is a matter for

---

[5]Circumstantial evidence is "just as probative as any other type of evidence." *Garrison v. Burt*, 637 F.3d 849, 855 (8th Cir. 2011); *see Holland v. United States*, 348 U.S. 121, 140 (1954) (circumstantial evidence is "intrinsically no different from testimonial evidence," and "[i]f the jury is convinced beyond a reasonable doubt, we can require no more").

[6]The substantive elements of state crimes are defined by state law. *Jackson*, 443 U.S. at 324 n.16. Under Arkansas law, a person commits first-degree murder if "with a purpose of causing the death of another person, [he] causes the death of another person." Ark. Code Ann. § 5-10-102(a)(2). A person "acts purposely with respect to his or her conduct or a result of his or her conduct when it is the person's conscious object to engage in conduct of that nature or to cause the result." *Id.* § 5-2-202(1).

the jury when criminal intent may be reasonably inferred from the evidence.

Here, there was evidence that McClard had previously discussed robbing Cummins by bashing in his head. There was evidence that he owed Cummins money and had been cut off from his supply of drugs. Therefore, there was evidence of some motive for the shooting. In addition, McClard initially denied shooting Cummins and concocted a detailed story to deflect suspicion onto some other persons. He then drove the car away from the crime scene and hid the weapon under leaves and pine straw. There was also evidence that it would be very difficult for that particular type of gun to go off accidentally. Thus, there was sufficient evidence upon which the jury could infer that McClard purposefully shot Cummins.

*McClard, supra* at 5-6 (citations omitted).

The decision of the Arkansas Court of Appeals was not contrary to the legal standard articulated in *Jackson*. *See Dansby v. Hobbs*, 766 F.3d 809, 817-18 (8th Cir. 2014) (Arkansas courts' standard for assessing sufficiency of the trial evidence is "consistent with *Jackson*"). Moreover, the state court's determination that the trial evidence was sufficient was not objectively unreasonable. Viewing the evidence in the light most favorable to the prosecution, a rational juror could find that McClard purposely caused the death of Allen Cummins on June 24, 2010.

Affording due respect to the role of the jury and the state court, as required by *Jackson* and § 2254(d)(1), the Court concludes that McClard's sufficiency-of-the-evidence claim is without merit.

### B.    McClard's Ineffective Assistance of Counsel Claims

Respondent argues that McClard procedurally defaulted all of his ineffective assistance of counsel claims.[7]

Before seeking federal habeas review, a state prisoner must first "exhaus[t] the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). When a habeas petitioner fails to raise his federal claims in the state courts in compliance with the relevant state procedural rules, he "deprives the State of 'an opportunity to address those claims in the first instance' and frustrates the State's ability to honor his constitutional rights." *Cone v. Bell*, 556 U.S. 449, 465 (2009).

Here, McClard did not raise any of his ineffective-assistance-of-counsel claims in the state courts of Arkansas in a timely and procedurally correct manner. Accordingly, this Court is barred from reaching the merits of the claims unless McClard can demonstrate "cause" for the default and "actual prejudice" as a result of the alleged violation of federal law, or demonstrate that the failure to consider his claims will result in a fundamental miscarriage of justice.[8] *Coleman v. Thompson*, 501

---

[7]Specifically, Respondent argues that: (1) although McClard argued, in his Rule 37 petition, that counsel was ineffective for failing to file motions to suppress and failing to timely move for a mistrial, he abandoned those claims when he did not appeal the Rule 37 denial; and (2) McClard never argued, in state court, that counsel was ineffective for failing to call a ballistics expert about a "live" round in the rifle.

[8]McClard does not allege "actual innocence," which is necessary to invoke the "fundamental miscarriage of justice" exception to the cause-prejudice requirement. *See Murray*

U.S. 722, 750 (1991).

In *Martinez v. Ryan*, 132 S. Ct. 1309 (2012) and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), the Court recognized that, in a narrow range of habeas cases, a petitioner can rely on his lack of counsel or ineffective assistance of counsel, which occurred at *the initial step of post–conviction review*, to establish "cause" to excuse his procedural default of an ineffective-assistance-of-counsel claim. The Eighth Circuit has made it clear that, in § 2254 habeas claims arising in Arkansas, the *Martinez* exception only allows a district court to "to find 'cause,' thereby excusing a habeas petitioner's procedural default ... where (1) the claim of ineffective assistance of trial counsel was a 'substantial' claim; (2) the 'cause' consisted of there being 'no counsel' or only 'ineffective' counsel during the state collateral review proceeding; and (3) the state collateral review proceeding was the 'initial' review proceeding with respect to the 'ineffective-assistance-of-trial-counsel claim.'" *Dansby*, 766 F.3d at 834.

McClard has satisfied the second and third elements of *Dansby* because he lacked counsel during the state post-conviction proceeding, and it was the "initial"

---

*v. Carrier*, 477 U.S. 478, 496 (1986) (where constitutional violation "has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default"). Accordingly, the Court need not address that issue.

proceeding in which he could have raised his ineffective assistance of counsel claims.[9]

However, to invoke the *Martinez* exception, McClard must also satisfy the first

element of *Dansby*, which requires him to establish that his "underlying ineffective-

assistance-of-trial-counsel claim is a substantial one."[10] *Martinez*, 132 S. Ct. at 1318;

*Dansby*, 766 F.3d at 834.

For an ineffective-assistance-of-counsel claim to have "some merit," a prisoner

must establish that his attorney's conduct "fell below an objective standard of

reasonableness ... under prevailing professional norms," *and* that the "professionally

unreasonable" conduct of counsel "prejudiced the defense."[11] *Strickland v.

Washington*, 466 U.S. 668, 687-88, 691-92 (1984). If a prisoner fails "to establish

---

[9]Respondent argues that the *Martinez* exception does not apply to McClard's first two ineffective-assistance claims because he defaulted them by *failing to appeal* the initial denial of Rule 37 relief. *See Martinez*, 132 S. Ct. at 1320 (its holding does not extend to defaults that occur in "appeals from initial-review collateral proceedings"); *Arnold v. Dormire*, 675 F.3d 1082, 1087 (8th Cir. 2012) (*Martinez* is not applicable to excuse default of ineffective-assistance claims that were litigated in initial-review post-conviction proceedings, but not preserved in the post-conviction appeal). However, it is clear that McClard first defaulted these two claims when he failed to properly serve his *pro se* Rule 37 petition, *i.e.*, at the initial level of collateral review. Thus, the *Martinez* exception must be considered.

[10]According to the Court in *Martinez*, for an ineffective-assistance-of-counsel claim to be "substantial," the habeas petitioner must demonstrate that his claim: (1) has "some merit"; and (2) is supported by at least some facts. *Martinez*, 132 S. Ct. at 1318-19. If a habeas petitioner is unable to satisfy either part of this "substantiality test," his ineffective-assistance-of-counsel claim is procedurally defaulted and cannot be considered by a federal court in a § 2254 habeas action.

[11]The defendant is prejudiced by the deficient performance if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland, infra* at 694.

either *Strickland* prong [it] is fatal to an ineffective-assistance claim." *Worthington v. Roper*, 631 F.3d 487, 498 (8th Cir. 2011).

Thus, to determine if McClard's ineffective-assistance-of-counsel claims have "some merit," this Court must decide: (1) if his trial counsel's alleged misconduct "fell below an objective standard of reasonableness"; and (2) if so, whether it "prejudiced the defense." If the *Strickland* standard is not met, as a matter of law, McClard's ineffective-assistance-of-counsel claims are without merit and cannot be deemed "substantial" claims under *Martinez*.

### 1. Trial Counsel's Alleged Failure to Move to Suppress McClard's Custodial Statements

McClard argues that his attorney was ineffective for failing to move to suppress his June 26 and June 28, 2010 statements as "illegally obtained" because officers continued to question him after he had invoked his right to counsel. In addition, McClard contends that the officers "coerced" him into giving the June 28, 2010 statement, against the advice of his attorney, by keeping him under "duress" in segregation for a period of time, then offering to let him out of segregation, call his mother and his attorney, and smoke a cigarette, only if he would talk to them. He also challenges the June 28, 2010 statement because it was not video-recorded, audio-recorded, or written down. *Doc. 2-1, at 5, 11-12; Doc. 7, at 1-2, 4.*

As mentioned, McClard gave three statements to police following the June 24,

2010 shooting of Cummins: (1) a written exculpatory statement on June 25, 2010; (2) a videotaped exculpatory statement on June 26, 2010; and (3) an unrecorded oral statement on June 28, 2010, in which he stated that he accidentally shot Cummins.

At a pretrial hearing three months before trial, McClard's attorney told the trial court he was considering whether to file any motions regarding the statements but was "not sure what all of those will be at this point in time." (R. 95-96.) He said he did not think voluntariness was an issue, but was not willing to waive a hearing at that time. (R. 100-01.) McClard's attorney did not file any motions to suppress, and no hearing was ever held.

On the first day of trial,[12] the state filed an amended information charging McClard as an habitual offender. (R. 7.) McClard's attorney objected, stating, "[I]f I had been told this was a habitual case I might have filed a motion to suppress [McClard's] statement saying that law enforcement put undue pressure on him after they knew he had been instructed by his attorney to remain silent." (R. 110-11.) Counsel stated that he had elected not to file a motion a suppress and instead chose to "go ahead and go forward" with McClard's June 28, 2010 statement that the shooting was accidental. (R. 105-06.) According to counsel, the defense strategy was that "yes, [McClard] did, in fact shoot Mr. Cummins but it was accidental, and so Mr. McClard

---

[12]The jury trial was held on June 29, June 30 and July 1, 2011.

would testify." (R. 105.) The trial court overruled defense counsel's objection to the amended information. (R. 112.)

At trial, Deputy Barbie Koder and Chief Deputy Aaron Collier testified about the June 26, 2010 interview at the Malvern Police Department. (R. 271-72, 360-61, 385, 388.) The video of the interview, which lasted almost two hours, was played for the jury.[13] (R. 273-350.)

According to the video transcript and the officers' testimony, Koder first read McClard his rights, using a standard form advising: (1) he had the right to remain silent; (2) anything he said could be used against him in a court of law; (3) he had the right to talk to a lawyer and have the lawyer present during questioning; (4) if he could not afford a lawyer, one would be appointed to represent him before any questions were asked; and (5) he could decide at any time during the questioning to exercise any of his rights and he would not have to answer any more questions. As Koder read each right and asked McClard if he understood, McClard answered, "Yes, ma'am." (R. 273-75.) Beside each right on the form, McClard wrote "yes" and his initials. (R. 670.) McClard signed the "Waiver of Rights" section of the form, stating: "I have read the above statement of my rights and I understand each of those rights,

---

[13]Although McClard's attorney stated that he had no objection to admission of the substance of any of the three statements, he objected to the playing of the videotape of the June 26 statement, as unduly prejudicial, because the other two interviews were not videotaped or otherwise recorded. (R. 251-53.) The trial court overruled the objection. (R. 254.)

and having those rights in mind I waive them and willingly make a statement." (R. 275, 670.) The form was also signed, at 10:06 p.m., by Koder, with Collier as a witness. (R. 670.)

In the June 26, 2010 interview, McClard gave a detailed account of his activities on the day of the shooting, including gardening at his home, and later walking his dog and looking for muscadine vines near the cemetery. He said Cummins came by McClard's house that day and, when Cummins left, he was followed by two unknown men in a red Nissan Pathfinder. (R. 279-342.) This account was generally consistent with McClard's previous statement, given to officers on June 25. (*See* R. 369-71, 692-94.)

After answering a number of questions from Koder and Collier, McClard asked, "[W]hen am I going to get to call my lawyer and call my mom?" Collier said "they'll let you call them," and left the room. (R. 342.) Although not expressly stated in the interview transcript, it appears that Koder remained in the room with McClard. After Collier left, no further questions were asked of McClard. However, McClard continued to talk for some time, mostly ranting against the officers for "drilling [him] till all hours," not letting him call his mother, and trying to make him "fold" and "say something that [he] did not do." (R. 342-49.) He made three more references to being

allowed to call his lawyer. (R. 344, 346, 348.)[14] When Collier returned to the room, he said McClard was being taken to the jail and would be allowed to make a phone call when he got there. (R. 349.)

Collier testified that McClard was "jittery" and "acted weird, kind of agitated" during the June 26 interview. (R. 385.) Koder described McClard as "very wirey" and said he appeared to be under the influence of something. (R. 361.)

On June 28, 2010, at about 10:30 a.m., Deputy Courtney Henry was working in the jail when she overheard McClard tell another inmate that he (McClard) had accidentally shot Cummins. She testified that McClard then told her, without being questioned, that the gun accidentally discharged and hit Cummins. She asked him if he would be willing to talk to Chief Collier. McClard said he would, if he could call his attorney and his mother first. (R. 364-66.)

Shortly after being contacted, Collier and Lt. Blake Zavadil came to the jail to speak with McClard. According to the officers, McClard told them he wanted to talk, but wanted to first call his lawyer and his mother. They allowed him to do so. (R. 372,

---

[14]The three references were: (1) "[W]onder how my lawyer will like that s— if I ever get to f------ call my G----- lawyer." (R. 344); (2) "So let me f----- call my mom and let me call my f------ lawyer, that's all I need to do." (R. 346); and (3) "I've already done more than what my lawyer would have allowed me because, if you'll look in my wallet, there's a f---- card in there that ... tells you exactly what you can do and ... it says that I do not say nothing until contacted by my attorney. I should have f---- said that in the first place, you got 36 hours out of me and then I walk. I do know a little bit about the law too, maybe not enough to call myself a f---- lawyer, but I know enough to get by." (R. 348).

375-76, 388-90.)[15]

Collier then asked McClard if he still wanted to speak to them. McClard said he did. (R. 375-76, 389.) Collier and Zavadil read him his rights, using the standard form. (R. 372, 389, 696.) Beside each right, McClard wrote "yes" and his initials. He signed the "Waiver of Rights" section of the form, stating: "I have read the above statement of my rights and I understand each of those rights, and having those rights in mind I waive them and willingly make a statement." (R. 696.) The form was signed, at 12:03 p.m., by Zavadil, with Collier as a witness.

Collier testified that, after McClard executed the rights-waiver form, Collier asked him "what happened, when it happened and where it happened." (R. 376.) McClard told him that "Cummins came to his home, everything was an accident and he said he used a rifle, told me where it was and how to get it, and drew me a map to how to get it." (R. 376; *see* R. 383, 396-97.) Collier testified that, at some point, McClard said he did not want to answer any questions without his lawyer. Collier said he stopped the interview "right then." (R. 393-95.)

The June 28, 2010 statement was not written down, nor was it recorded by audio or video. (R. 384, 390-91.) Collier testified that, during the interview, McClard

---

[15]At trial, McClard's attorney said he was out of state when McClard was arrested, but acknowledged that McClard had called him and that the attorney told him not to give any statements. (R. 106.) McClard's mother testified that McClard called her as well, saying he "wanted to come clean [and] tell the truth" and did not want to wait for his lawyer. (R. 610-11.)

appeared "calm," but expressed some emotion and "cried for a minute." (R. 395.) According to Collier, McClard gave this statement in the sally port area of the jail, where they sat at a picnic table. McClard was shackled. (R. 389-90.)

McClard also testified about the circumstances surrounding the giving of his June 28, 2010 statement. He testified that, after he realized that Deputy Henry had overheard his conversation with the other inmate in the jail, he asked to talk to investigators so he could tell them what happened. (R. 523-25.) He stated that he "was trying to find somebody to talk to as far as who I needed to talk to, it would be the best option to tell that to without my lawyer, Mr. Loyd, present because obviously I did it without him present, when he told me to, when he told me not to say nothing I still went above and beyond to let – to tell them what happened." (R. 526.)

McClard testified that he asked for Collier to come to the jail and talk to him. He said the officers took him to the sally port area of the jail, where he was allowed to smoke a cigarette, and to call his mother and his attorney. He said the interview lasted 15-30 minutes. (R. 526-27.)

McClard confirmed that he ended the interview by telling the officers he did not want to say anything else without his attorney. He said he wanted to end the interview because he had "already went against his [attorney's] direction to talk to them in the first place." (R. 527.) He said the officers did not ask any further questions at that

time, and never returned to question him further. (R. 528.)

McClard testified that he had "made up" the June 25 and June 26 exculpatory statements because he was "inebriated" and "under the influence of drugs." (R. 534-39.) He testified that he "told the truth" on June 28, after he had "sobered up," and that he was telling the truth at trial. (R. 523, 534-38.)

In his opening statement and in his closing argument, McClard's attorney pointed out that McClard's June 28, 2010 statement was given against counsel's advice. (R. 210-11, 590-91.)

In light of this record, McClard has failed to establish either element of *Strickland*, *i.e.*: (1) that his attorney's failure to file a motion to suppress the June 26 and June 28 statements was objectively unreasonable; and (2) a reasonable probability that, if his attorney had filed a motion to suppress, it would have been granted and the outcome of his trial would have been different.

First, the transcript of McClard's pretrial and trial proceedings shows that his attorney considered whether to move to suppress any of his statements but clearly decided, as a matter of strategy, to "go forward with" McClard's account of an accidental shooting. Under *Strickland*, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690-91. Judicial scrutiny of counsel's

performance must be "highly deferential," and events must be viewed from counsel's perspective at the time of trial in an effort to "eliminate the distorting effects of hindsight." *Id.* at 689; *see Flowers v. Norris*, 585 F.3d 413, 417-18 (8th Cir. 2009) ("strategic and tactical decisions by counsel, though they may appear unwise in hindsight, cannot serve as the basis for an ineffective-assistance claim under *Strickland*").

Next, the circumstances do not demonstrate that a motion to suppress the June 26 or June 28 statement probably would have been successful.

McClard's only argument regarding the June 26, 2010 statement is that it was taken after he had "asserted on four different occasions during the custodial interrogation that he wished to speak to his attorney, but questioning continued regardless of petitioner invoking his right to have counsel present." *Doc. 2-1, at 11*; *see also Doc. 7, at 1.*

When a suspect requests counsel during an interrogation, police must cease questioning until counsel has been made available or the suspect initiates communication with the police. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). However, the video transcript of the June 26, 2010 interview makes it clear that there was no *Edwards* violation. The first time McClard asked about calling his attorney, all questioning ceased and Chief Deputy Collier left the room. (R. 342.) Although

McClard made three other references to calling his attorney, these were not in response to questioning by the officers. It is undisputed that, after Collier left, the officers asked no further questions and that they did not return to question McClard on June 26 or the following day, June 27. Thus, any motion to suppress the June 26, 2010 statement based on *Edwards* would have been unsuccessful.

The next determination is whether, after invoking his right to counsel on June 26, 2010, McClard validly waived that right before giving another statement on June 28, 2010. This inquiry has two dimensions: (1) whether McClard "initiated" communication with the officers by "evinc[ing] a willingness and a desire for a generalized discussion about the investigation"; and (2) whether, under the totality of the circumstances, McClard voluntarily, knowingly and intelligently waived his previously invoked right to counsel. *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983); *see Holman v. Kemna*, 212 F.3d 413, 420 (8th Cir. 2000).[16]

The evidence was undisputed that, on June 28, 2010, McClard "initiated" a conversation with Deputy Henry and indicated a willingness to talk to investigators. McClard's testimony was clear: "I looked at her [Henry], and I said can you call CID,

---

[16]A waiver is voluntary "if it is the product of a free and deliberate choice rather than intimidation, coercion or deception." *Holman*, 212 F.3d at 420. A waiver is "knowing and intelligent" if it has been made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* These determinations depend "upon the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." *Bradshaw*, 462 U.S. at 1046.

I want to talk to them and tell them what happened." (R. 524-25.) When Chief Deputy Collier and Lt. Zavadil arrived, they were careful to ensure that McClard wanted to proceed and asked no substantive questions until he had called his attorney and his mother, and had signed a rights-waiver form. Again, McClard's testimony was clear that he wanted to talk to Collier and Zavadil and that he knew, in doing so, he was going against his attorney's advice. (R. 526.) It is also undisputed that, once McClard told the officers he did not want to talk anymore without his attorney, the officers immediately ended the interview and did not return to question him again.

In addition, the totality of the circumstances demonstrate that, before giving his statement on June 28, 2010, McClard validly waived his right to counsel.

McClard was twenty-five years old at the time of the interview. He had received his GED, and could read and write. (R. 273-74, 670, 696.) He testified at trial that he previously had been convicted of two felonies. (R. 490.) A pretrial forensic examination found him to be without mental disease or defect and having the capacity for the mental state to commit the crime, to appreciate the criminality of his conduct, to conform his conduct to the law, to understand the proceedings against him, and to assist with his own defense. (R. 47.) His score on the GCCT, a test to assess his ability to assist his attorney and his understanding of the legal process, was 96 out of 100. (R. 51.) He was found by the trial court to be competent based on the forensic exam

results. (R. 86-87.)

The record is devoid of any evidence that the police officers resorted to physical or psychological pressure, violence, threats or promises, overly lengthy questioning, trickery, or deceit to elicit a rights-waiver or statement from McClard on June 28, 2010. Importantly, the officers informed McClard of his rights before any substantive questions were asked, and McClard indicated that he understood them all. On two prior occasions, June 25 and June 26, 2010, McClard also had been informed of his rights and indicated that he understood them. On all three occasions, he signed a rights-waiver form, stating that he understood his rights, was waiving those rights, and wanted to speak with the officers. (R. 690 [June 25], 670 [June 26], 696 [June 28].)

Finally, the officers' failure to record the June 28, 2010 interview and rights-waiver did not render them invalid or inadmissible. At the time of the interview, there was no requirement, under state or federal law, that a custodial interrogation be recorded. *United States v. French*, 719 F.3d 1002, 1007 (8th Cir. 2013) ("[T]he Constitution does not mandate electronically recording a defendant's custodial interrogation."); *Jenner v. Smith*, 982 F.2d 329, 331 n.2 (8th Cir. 1993) (incriminating statements are not inadmissible simply because the police failed to record the conversation); *Clark v. State*, 287 S.W.3d 567, 574 (Ark. 2008) ("[W]e decline to recognize a constitutional right to recordation [of a police interrogation] under the due

process clause in the Arkansas Constitution.").[17]

Thus, McClard has not established: (1) that trial counsel's conduct "fell below an objective standard of reasonableness" in failing to move to suppress the June 26 and June 28 statements; or (2) a reasonable probability that, if his trial counsel had performed differently, the outcome of his criminal proceedings would have been different. More specifically, he has not established that the trial court would have granted such a motion under the circumstances set forth above.

Because this ineffective-assistance claim has no merit under *Strickland*, it is not a "substantial" claim that excuses McClard's procedural default under the *Martinez* exception. Accordingly, McClard has procedurally defaulted this ineffective-assistance-of-counsel claim, and the Court is barred from considering its merits.

## 2.    Trial Counsel's Alleged Failure to Timely Move for a Mistrial

McClard argues that his attorney failed to timely move for a mistrial when a witness, during sentencing, referred to a plea offer when no such offer ever was made. He argues that the testimony violated Arkansas's rules prohibiting evidence of plea offers, and "prejudice[d] the petitioner and affect[ed] the outcome of sentencing." *Doc. 2-1, at 7.*

The record shows that, during the sentencing phase of trial, one of the victim's

---

[17]In 2012, Rule 4.7 was added to the Arkansas Rules of Criminal Procedure, providing that "[w]henever practical," custodial interrogations "should be electronically recorded."

family-members testified that McClard rejected a plea offer of twenty-five years. (R. 606.) McClard's counsel immediately objected: "Your Honor, I'm going to object to that, that is inaccurate, there never was a plea offer made in this case." (R. 606.) The trial court sustained the objection and instructed the witness that "you can't talk about what might or might not have been offered." (R. 607.)

When cross-examining the witness, McClard's counsel returned to the subject matter, asking her if she had any knowledge of a plea offer. She said the victim's family had told the prosecutor they "would be happy with twenty-five years" if McClard "would admit what he did." (R. 607-08.) In response, McClard's counsel stated that he had represented McClard from the outset of the case and "there has never been a plea offer made, and so on behalf of my client, let me just clarify to you that he never turned a plea offer down ... [b]ecause none was ever given to him." (R. 608.)[18] McClard's mother later testified that she and McClard wanted and "almost begged" for a plea offer, but none was forthcoming. (R. 610.)

After the jury began deliberations, McClard's attorney moved for a mistrial due to the witness's comments, which he said had "the potential to inflame" the jury in determining McClard's sentence. (R. 618-19.) The trial court denied the motion on the basis that the statement was inadvertent, counsel appropriately and promptly objected,

---

[18]McClard's attorney earlier had advised the trial court, at the beginning of trial, that "there were no offers in this case." (R. 113.)

and then counsel "followed up on and turned [the matter] around positively for the defense." (R. 620.)

In McClard's direct appeal, the Arkansas Court of Appeals held that, despite defense counsel's objection to the testimony, any error was not preserved for appellate review because counsel did not move for a mistrial on that point until after he had questioned the witness and after the jury had begun deliberations. *McClard*, *supra* at 7.

As the trial court noted, the efforts of McClard's attorney clarified the plea offer issue and alleviated any prejudice from the witness's comment. In light of this record, McClard has not established that his attorney's failure to move for a mistrial earlier was objectively unreasonable or that, if counsel had so moved, the trial court would have granted the motion and the outcome of his criminal proceedings would have been different.

Because McClard has not established a "substantial" and meritorious ineffective-assistance-of-counsel claim arising from his counsel's failure to move for a mistrial earlier, the *Martinez* exception cannot excuse his procedural default of that claim. Accordingly, this Court is now barred from considering the claim.

### 3.    Trial Counsel's Alleged Failure to Call Ballistics Expert

McClard argues that his attorney was ineffective for failing to call expert

witnesses or specialists to rebut Chief Deputy Collier's testimony that a "live" round was left in the rifle. *Doc. 2-1, at 14; see* R. 382. He also argues that counsel failed to offer any expert witnesses on "ballistics, trajectory, [or] firearms" to corroborate his theory of an accidental discharge. *Doc. 7, at 5.*

Respondent contends that this is not a "substantial" ineffective-assistance claim because whether a live round was in the gun when it was found by police is a "collateral matter," in that McClard admitted he shot the victim and his only defense was that the shooting was accidental. The Court agrees.

Moreover, McClard's attorney undermined Collier's testimony about a purportedly live round by eliciting an admission from him that, although the round was logged into the evidence locker, it could no longer be located. (R. 386.) In addition, in McClard's testimony, he conceded that a live round might have been in the gun:

> It's very possible that after it happened and in the rush and hubbub and everything, like I said I was very distraught during the whole thing, I very possibly could have reached in my pocket and just dropped another shell in and then just went and hid it. Like I say, I was very, very messed up during all this; I've been getting high religiously since I'd gotten home.

(R. 498.) McClard thus has failed to show that his attorney was ineffective in failing to further explore the existence of a "live" round.

Finally, McClard has failed to demonstrate that counsel was ineffective for

failing to obtain expert testimony to support his claim that the rifle accidentally discharged. The medical examiner testified that the wound location and the path of the bullet fragments were consistent with a gun being aimed at the victim from more than three feet away, as well as with scenarios where a gun was fired from under the shooter's arm. (R. 231-34.) McClard's attorney further questioned the medical examiner regarding the trajectory and angles, and then asked: "[W]ould it be possible if the person is seated in a vehicle and I'm standing outside the vehicle with the gun underneath my shoulder, that angle could be achieved just like I'm standing here right now, if a person is sitting in a vehicle in front of me?" The examiner answered, "If you bring the individual up to where that bullet goes over the door, yes, sir, that is compatible." (R. 235-36.)

In his testimony, McClard demonstrated how he was holding the rifle, described in detail where he was standing in relation to the victim's car, and explained in detail how he thought the gun could have discharged. (R. 500-01, 540-42, 546-59.) Photographs were introduced of McClard's house and driveway. (R. 700.) In addition to McClard, the medical examiner and two law enforcement officers testified about the operation of the rifle, demonstrating how to load and fire it. (R. 230-33, 380-83, 398-402, 550-53, 707.)

In his closing argument, McClard's attorney emphasized that the state had built

its case on "this could not have been an accident," rather than proving purposeful intent, as required for first degree murder. He said the state's theory was "if it wasn't an accident, then he must have killed him on purpose." McClard's attorney further argued that McClard and the victim had an "amicable, a friendly relationship," and there was insufficient evidence of "bad blood" between them, or a motive for purposeful murder. (R. 586-91.)

In light of this record, McClard has not demonstrated that any expert testimony regarding ballistics or firearms could have bolstered his defense. He thus has failed to show that his attorney's conduct was objectively unreasonable, or a reasonable probability that, if he had obtained expert testimony, the outcome of his criminal proceedings would have been different.

Because McClard has not established a "substantial" and meritorious ineffective-assistance-of-counsel claim arising from counsel's failure to obtain expert ballistics testimony, the *Martinez* exception cannot excuse his procedural default of that claim. Accordingly, this Court is now barred from considering the claim.

### D.   State Courts' Use of an Erroneous Standard for Assessing Validity of McClard's Waiver of Right to Counsel

McClard's remaining claim is that the state courts applied an erroneous standard for determining the waiver of his right to counsel by focusing on the voluntary nature of his statements, rather than on whether he understood his right to counsel and

intelligently and knowingly relinquished it. Because McClard did not challenge the validity of his rights-waivers in the trial court or in his direct appeal, there is no state-court ruling for this Court to review to determine if it was "erroneous."[19] Accordingly, this claim is without merit.

## III. Conclusion

IT IS THEREFORE RECOMMENDED THAT this 28 U.S.C. § 2254 Petition for Writ of Habeas Corpus, *Doc. 2-1*, be DENIED, and that this case be DISMISSED in its entirety, with prejudice.

IT IS FURTHER RECOMMENDED that a Certificate of Appealability be DENIED, as McClard has not made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(1)-(2); Rule 11(a), Rules Governing § 2254 Cases in United States District Courts.

DATED THIS 29th DAY OF May, 2015.

_____
UNITED STATES MAGISTRATE JUDGE

---

In discussing another matter, the trial court did state that, because McClard admitted that he shot the victim and the only issue was whether the shooting was accidental or purposeful, all of his statements "should be admissible even over [counsel's] objection." (R. 252.) However, this passing comment cannot be construed as a ruling on the validity of his rights-waivers.